451 P.2d 583

STATE of Utah, Plaintiff and Respondent,

v.

Rebecca Martinez JIMINEZ, Defendant and Appellant.

No. 11346.

Supreme Court of Utah.

March 5, 1969.

F. Robert Reeder, Salt Lake City, for defendant and appellant.

Vernon B. Romney, Atty. Gen., Joseph P. McCarthy, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

ELLETT, Justice:

The defendant appeals from a conviction of the crime of murder in the second degree, claiming that the trial court erred in failing to suppress testimony regarding an oral statement which she made in the police station before she was formally placed under arrest.

The defendant and the victim had lived together in a common-law marriage relationship for some eight or nine years.[1] The victim died as a result of a stab wound in the chest. When the police were called to the scene about midnight, they took the defendant, her daughter, and her son-in-law to the station for questioning, but before any questions were asked her, she was given the Miranda warning in full. All three were suspects.

About one thirty in the morning the defendant was asked what happened. She said that she and her husband were in the apartment of Frank Barrio, a tenant in the

---

1. Utah does not recognize common-law marriages which are entered into in this state.

same apartment building with her, and that deceased and Barrio had an argument, and the deceased was ordered out of the apartment. She said that thereafter she left and on the way to her apartment saw a man with a deformed right arm leaving from the back of the apartment building. She said he looked like a man who worked for Joe Doctorman and that he had pock marks on his face. She also said that when she got to her apartment, her husband was standing under the archway between the living room and kitchen and that he had a red substance on his front; that he bent over the bed and lay down. She said she then went to the Barrio apartment and called her daughter and told her what had happened.

This questioning lasted for 20 to 35 minutes.

In the meantime, another officer went to Barrio's apartment and brought him to the police station.

About two thirty in the morning a second conversation took place with the defendant (after her rights under the Miranda case were fully explained again), wherein certain apparent discrepancies in her prior statements were mentioned to her. She had said that she never got near her husband, but she could not now explain how what appeared to be blood came to be on her clothing. She was asked about how she could tell that the stranger she claimed to have seen leaving the apartment house in the dark had pock marks on his face and how she knew about the deformed right arm. She replied that maybe she imagined a figure running from the back of the apartment house. She then said, "If you want the answers to your questions, ask Frank [Barrio]." When asked what Frank knew, she said that after Frank ordered her husband out of the apartment, he followed but soon returned and went to the sink in his apartment where he washed a knife and left it there. She said she then left and went to her apartment and found her husband stabbed.

This conversation lasted approximately 25 minutes.

All other known persons who might have committed the crime or who might have had knowledge of facts which would lead to its solution were also being questioned during this time. Except for some inconsistencies in her statements, there was nothing to indicate that the defendant was the guilty person.

The officers were not attempting to get evidence to connect her with the crime, they were merely trying to find out who committed it. The finger of suspicion had not yet begun to point to her to the exclusion of the others.

About four o'clock in the morning the officers again talked with the defendant, after advising her for the third time of her rights as laid down in the Miranda decision.

·She allowed one of the officers to scrape from her toenails a substance resembling blood, and when he had left the room, without any question being propounded to her, she in substance told the other officer, "I can fool you, but I can't fool God. I stabbed Jiminez." She continued by saying that she went to Barrio's apartment, washed the knife, and called her daughter and told her something had happened to Jiminez.

This statement was voluntarily made and at a time when she was not under arrest. When the officer asked her if she would make a written statement to that effect, she said she wanted to see a lawyer, whereupon all questioning stopped, she was placed under arrest, and a lawyer was called.

Each officer who talked to the defendant gave her the so-called Miranda warning prior to asking her any questions. These men all stated that the defendant was not detained against her will, that they as officers were merely trying to determine who killed her husband, and that she could have left the station at any time she chose to do so. There is no claim that there was any force, threats, or duress made or used by any of the officers who talked to her.

The court permitted the State to place in evidence the substance of the conversation had with the defendant. The defendant claims this violates the law as laid down by the United States Supreme Court in the case of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694 (1966).[2] That case held:

Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is. this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. * * *

\* \* \* \* \* \*

In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in

---

2. The holding of that case is not to be admired, but it is binding upon state courts, and so we must, for the present, recognize it as the law.

evidence. \* \* \* Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

\* \* \* He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. \* \* \*

▇ Here the common-law wife of the deceased was interrogated three times. The first time she misled the officers by having them seek for a man with a deformed right arm and a pock-marked face. Later when she was questioned further about some inconsistencies in her statements to the officers, she accused Barrio of the crime. Further investigation led the officers to doubt the truthfulness of that accusation, and upon the third interrogation of the defendant she volunteered the statement, "I can fool you, but I can't fool God. I stabbed Jiminez." Only at that time did the officers have an answer to the question of who stabbed Jiminez. She was asked if she would sign a written statement and replied that she wanted to see her lawyer first. At that time all questioning stopped, and a lawyer was called. It is obvious that it was the whispering of the defendant's conscience rather than any improper questioning on the part of the officers which prompted her to tell the truth. The so-called Miranda rule applies to custodial interrogation. However, even in such a situation statements not induced by a question are admissible. See Lamb v. Peyton, D.C., 273 F.Supp. 242. Here the wife of the deceased pretended to be interested in finding the one who had stabbed her husband. She voluntarily gave false information to the officers, apparently hoping to divert suspicion away from herself and onto others. The officers were trying to solve the mystery. No one was under custodial detention. All theoretically were trying to help. The Miranda warning was given and was observed because as soon as the defendant requested her attorney, all questioning ceased, and the attorney was called.

This case also differs from the Miranda case in that here the interrogating officers had never read the book by Inbau and Reid, much less used the techniques set forth therein for securing confession.[3] They were simply asking for information which might lead to the discovery of the

---

3. I assume the evidence in Miranda showed that the interrogating officers there were students of Inbau and Reid and applied the techniques described in the Miranda opinion. Otherwise, we would have to believe that the Supreme Court of the United States considered evidence which was not in the record.

guilty person. Several people were being interrogated at the same time, all of whom were possible suspects. Not one of them was ever placed under arrest until the defendant admitted that she had stabbed her husband.

██ Even the Miranda case provides for admissions of confessions under the circumstances such as this. It seems clear to us that the questioned evidence was properly received by the court, and it together with other evidence presented to the jury justifies the verdict and judgment had in the trial court below. The defendant herself took the stand and testified regarding the events leading up to the time when her husband was fatally stabbed. She told about his choking her and told the jury that he kicked her in the privates, this while she was sitting in a chair. She has never denied that the so-called Miranda warning were given to her. She was *not* in custody; she *was* given the Miranda warnings; the confession given was *volunteered,* prompted by her conscience and not by a question from the police. She had a fair trial by a fair and impartial jury, and the verdict should stand.

The judgment of the trial court is affirmed.

CROCKETT, C. J., and CALLISTER and HENRIOD, JJ., concur.

TUCKETT, J., concurs in the result.